Petitioner of Health, Across Appalachia and Felons A and F of Respondent Appalachia, Across Appalachia. Arguing on behalf of Petitioner of Health, Across Appalachia, Attorney Mr. Michael G. Domenico. Arguing on behalf of Petitioner of Health, Across Appalachia, Attorney Mr. Stephen G. Domenico. Good morning everyone. And as we walked in we noticed it's a little cool in here. If it gets too bad and you freeze to your place, please let Mr. Mangan know. I used to have a bailiff who would keep it very cool in the room and she always said well she wanted to keep me from wrinkling. It didn't work. So we are ready for you Mr. Domenico. Thank you Your Honor. May I please be seated. This case is primarily a characterization of asset case. The primary asset in dispute argued in the appeal filed by myself is the characterization of my client's company, Olson Electric Company, which is a manufacturing company up in Richmond, Illinois in McHenry County. I just had a question about the status of this property on Commercial Drive. It's the building from which the company works, is that correct? That's correct. And it did not have a mortgage. That was totally paid for before the transaction here? Okay, and was there some sort of renovation to that building or addition to that building that required some financing during the course of this or was that all done before as well? There might have been renovations that occurred after the settlement of the probate litigation but there was a mortgage taken in conjunction with the settlement of the probate litigation which allowed the brothers to get their distributed share of the trust. I just wasn't sure from the descriptions that I had seen if it had any obligations on it. It was from a separate trust. Counsel, I have a question. The record reflects that in May of 1997, Mary Jane asked to disclaim 75 shares of Olson stock pursuant to a section of the probate act. What was the effect of that disclaimer and why was it not mentioned in her brief? We didn't see it as affecting the acquisition, that our client's acquisition of the stock or receipt of the stock was an inheritance, legally amounts to an inheritance. We didn't see how her disclaimer of the shares that she made prior to affected what legally we would characterize our client's receipt of the shares by way of the probate settlements. So, however, pursuant to the probate act, wasn't the effect that those 75 shares would actually be And so wouldn't those shares have passed to the three children at that time? Well, they were supposed to be put into the trust. I think we can all agree that the shares were, at some point, were supposed to be put into the trust and they weren't put into the trust and that was one of the complaints filed by one of my client's siblings that precipitated the probate litigation. That was one of the primary complaints. But, you know, pursuant to Mary Jane's role as trustee, she was empowered to distribute the shares at any time prior to, at any time during her lifetime as she saw fit as trustee. That's one of the rights that she was guaranteed. She was given in the August FS to revocable trust. So you're saying the disclaimer had no effect? We don't see it as having an effect. We don't see it as having an effect because the trust agreement controls the trustee, you know, defines her right to distribute to the beneficiaries at any time during their lifetimes all these orders, much of the principal, which included the shares, that she saw fit. Well, the disclaimer operated outside of the will and the trust, didn't it? Well, not outside of the will, but she said, okay, I disclaim them. So they never were really part of the whole process until later. Until later. But, again, as to my client and my client's receipt of the shares and what the law recognizes her receipt of those shares as, we didn't see it as affecting the claim that it's an inheritance. And because when we look at the resolution that was approved by the probate court and that it effectuated the intent of Mr. Asta's, not only his will, but the AFA trust, was that all of the shares were distributed to her and the two brothers received a like amount in cash. And that is a classic purse derbies distribution of a third of the remaining assets. But now the plain language of the settlement agreement that the family agreed to said that this was a purchase. I mean, why should we ignore that plain language? Because it's a form over substance point. In what way? In the way that while it was called a purchase in the settlement agreement, what they were really doing was acting pursuant to Mr. Asta's intentions as stated in the AFA trust and in his will. They were acting pursuant to his wishes as he left them. The probate court couldn't have approved the settlement if they were doing anything but executing his testamentary wishes. That's what probate courts do. Probate courts are in the role of guarding the intentions of the decedent. The decedent is dead. He's not there to make sure his intentions are effectuated. So you're saying they just found a different way to do it. That's correct. That's absolutely correct. That the lawyers may have used the word sale in the purchase doesn't make it so. And we cite the Jelinek case for that proposition that we look to the substance of the transaction and what actually occurred, not to the words that might be used. And, you know, I'm sorry, I was going to say following up on that, and I know the circuit court, I don't think we owe the circuit court any deference on this issue because I see this as a de novo review, as we have undisputed facts, and it's a characterization question. But to find a purchase like the judge did below, and as the blue brief argues, one thing to think about is that you don't see in any of the settlement documents, in any of the documents evidencing the transfer of funds, if there was a purchase, where was the capital gains tax? There would have had to have been a capital gains tax if there was a purchase of the shares because that's not what really occurred. And that's why we go back to the case law that says we don't look simply at the words on the page. We look at the substance of what this was and what these people did. And this was a settlement of family litigation, the purpose of which is to effectuate the intent of the deceased. That's the role of the probate court, and the probate court couldn't have approved this unless it effectuated his intent. Well, it wasn't part of his intent that his ex-wife would die before all of the distributions would happen. That was a condition pre-statement, wasn't it? No, it wasn't, ma'am. Well, isn't that what language's providing? No, that is a mistake. That is a finding of fact that is erroneous in the judgment. It is urged by the blue brief below. But I ask you to read carefully the AFA trust. Article 4, what they're pointing you to and what they're asking you to zero in on is Paragraph 4 of Article 4. It says, Upon the death of the grantor or upon Mary Jane's death, whichever shall later occur, the trustee shall distribute any unappointed portion of the assets per stirpes. Unappointed. The paragraph immediately before Paragraph 3 says, The trustee is hereby authorized to distribute to any one or more of the beneficiaries of the Residuary Trust at any time and from time to time during their lifetime all or as much of the principal of such trust as the trustee deems to be in their best interest. It's an acceleration clause. This is a very common estate planning device found in pour-over trusts like this. They are asking you to zero in on Paragraph 4, and they're asking you to not only zero in to the exclusion of Paragraph 3, which is contrary to what the cases say, we have to read all of the testamentary documents together to ascertain intent, but they're taking out the word unappointed. The trustee was free to distribute these assets in the precise way that she did. Death was not a condition preceding. Could they have settled this familial disagreement as they did without the provision about unappointed? I mean, they were in litigation. Correct. And there is some case law out there that says it makes sense to allow settlements because it saves the assets. The family relationship was dealt. Well, the family relationship, hopefully in this case it did, but it saves the assets, the attorney's fees, and things of that nature. But could they have settled this dispute in the way they did if they didn't have that Paragraph 3 about unappointed? Because essentially what Mary Jane did was she just said, fine, this is how I'm going to distribute it in effect, and I'll receive this in exchange. That's correct. But, again, she still fulfilled her obligation as trustee because she could only do that, she could only engage in this settlement agreement if she was acting within her scope, within her duties as trustee. And the trustee, so in the rest of Paragraph 3, there is a qualification on her rights in this regard as trustee to just distribute these things now prior to her death. It says prior that the trustee shall only make such distributions as the trustee deems necessary for the support of Mary Jane Asset during her lifetime. Now, putting aside that Mary Jane and the trustee are one and the same, she could very easily say, look, there's now this litigation, my children are fighting, we're going to spend a lot of attorney's fees, it's going to cost the estate, so I'm going to make the decision as the trustee what's best for the beneficiaries and what's best for myself. Because the settlement of the probate case included a provision that she receive a lifetime stream of support from the company, which is exactly what her late husband provided for her. And that's why his intention is perfectly effectuated by this. Now, if Kathy inherited these shares of Olsen stock, then why was she required and how should we look at the fact that she was required to mortgage three of her personal properties, sign a personal guarantee, have her husband sign a personal guarantee, and sign mortgages? Isn't that more consistent really with the purchase of assets? On the surface, it seems like it, because why do people borrow money, right? I would certainly agree that on the surface it seems like that. The fact of the matter is the loan was taken to effectuate Mr. Asta's intent. That's what was done. If you actually look at the transaction and how it actually occurred, my client got the shares before the loan even came into existence. That was a condition preceded from the bank. It had to go down that way. The money that was injected into the estate was simply to balance everybody out. My client got the shares for $2 million. Each brother got $2 million in cash. There just wasn't enough cash to give them both $2 million, pay the transaction costs associated with closing the estate. The attorneys had to get paid. There was accumulated estate taxes that needed to be paid. So the injection of funds wasn't merely just to purchase the shares because it was simply to effectuate the intent. And, again, that financing scheme was approved by the probate court to effectuate his intent. Now the brothers got two different amounts, though. They didn't each get $2 million. I mean, again, isn't that more consistent with the purchase than inheritance? Did it work out exactly to the dollar? No, but it's roughly the same, and that's close enough for a purse-derbies distribution. And it was certainly good enough for this probate judge in McHenry County to sign off on it, which is why I come back to the probate judge. When he signed off on this, that meant that this was effectuating his intent. And if his intent was effectuated and she received the shares pursuant to his testamentary documents, it's an inheritance. I have one question before I let you go on this issue. You said that Mary Jane said my children are fighting. Was it they were fighting or that they were unhappy with some of the things that she was doing? That's what I'm assuming about it. You're right. They took exception to some of the distributions she had taken. I think they wanted the shares to be transferred to the trust, the sub-trust. It was more about their disagreeing with how she was running things. You're right. And they, I mean, I saw a reference to up to $150,000 one year or something like that. But at the same time, each of these three children were receiving $65,000 a year whether they worked there or not, correct? That's correct. Okay. Thank you. Counsel, I would like you to say your name so I don't say it inappropriately. No problem. It looks like garage, but I'm sure that's not the way you'd like to say it. It's Gerage. Gerage. Thank you. My name is Gerage. Gerage. I'm here with James A. Pappas. Thank you. It's my honor to appear in the appellate court in the second judicial district today. Thank you for entertaining the issues on this important case, and I am prepared to speak or answer questions. Counsel, what is your view of the disclaimer and whether it had an effect here? That is a great question because it encapsulates a lot of what's going on in this particular case. This case stretches out over a period of time. The father dies in 1996. The mother, under pressure, signs a disclaimer in 1997. Then the case kind of just sits. Nothing really happens. One of the brothers is running the business. And then when the mom takes over and kicks him out, that's when all the trouble starts and the litigation starts. John files a case against the mother, says she's using up too many assets. Then the other brother joins in, and then mom and then Kathy join in. So the effect of the disclaimer, at the time, it's like a nullification. It was nullified because all of the parties and all of the companies to the state litigation had an active suit. And that suit dealt with the whole panoply of all the rights, the disclaimer, all the claims, and it had an outcome. And that outcome was sealed in the settlement agreement. And that agreement was approved by an agreed order of the probate court. So what effect it might have had in 1997 was nullified by the filing of the lawsuit and the settling of the lawsuit. So all of the panoply of estate rights for all of those parties was sealed in that settlement agreement and the agreed order which closed the estate. So effectively, in the extent to which it applies to the divorce case, it's the rights and the obligations of the parties to the probate suit and the settlement agreement and the agreed order and the consequences of that. And the consequences, as Your Honor had asked questions about the purchase and sale, they chose by their own hand to structure Kathy's receipt of the shares, 100% of the shares, on December 13th as purchase and a sale. The settlement agreement describes it as such. The agreed order of the probate court decides it as such. And that's exactly what happened. The trust transferred the shares to her on December 13th contemporaneous with all of the money that was borrowed. And it wasn't a small amount of money. It was $3.6 million that was secured by the personal guarantee of Mr. Pappas and Kathy Astow, by the three mortgages, by the continuing unconditional guarantee. All of these things were collateral in addition to the stock, in addition to the land, and everything else that Kathy and Jim owned was all collateralized. And that's where we come from in the case. But let me go back just a second. Sure. So you're saying that when these shares of stock were disclaimed, that the children's rights to those stock weren't vested then. They didn't necessarily possess them, but you're saying their rights to the stock wasn't vested then, proportionally, obviously. And if they were vested, the vestiture was dissolved by the litigation because it's the conclusion of the litigation which controlled the rights and allegations of all those parties. So if they were, for a period of time, vested, that vestiture was dissolved in the litigation and the settlement that each and all of the members of the family and all their businesses participated in, all done by agreement. There wasn't one beneficiary that objected to the settlement. In counsel's brief, he cites a case talking about the probate court only approving settlements that are consistent with the testator. It's not exactly what the case says. I looked at the case last night. It says if there is at least one beneficiary opposed to the settlement, the rest of the beneficiaries won. Then the probate court is reticent to push the settlement. But in this case, all the beneficiaries agreed. So it was a rubber stamp in some respects that the agreed order was entered approving the settlement agreement. Well, how does this – go ahead. I was just going to say. So why wasn't it a taxable transaction? That's counsel brought up. There's lots of taxes going on here. I'm sure. There were plenty of taxation events that took place on this settlement agreement and the agreed order and the distribution of all the assets. And all of the taxing authorities – there's an exhibit in the record that shows the closing statement. And any number of taxing entities were paid lots of money, one of which almost a million dollars. So taxes were paid relative to these transactions because – Relative to the stack or no? Well, the agreed upon price of $2 million set a basis in the stock for the recipient, Kathy Asta. So Kathy currently has $2 million – I'm not a tax accountant, but I would assume she has $2 million of basis in that stock. That stock is now valued in this case by stipulation at something like $8 million. So if she went to sell the stock, she'd have 2 million – she'd be paying capital gains on $6 million. So why she didn't have to pay taxes at the time, I don't think it was a taxable event to her. How about to the brothers? The brothers didn't receive the stock. The brothers received cash. There was already floating in this estate through securities, ironically, about $3.6 million. They borrowed a like amount, approximately another $3.6 million. They were off by $10,000. All of that money came into this closing and paid out lots of different people. Kathy walked away from the closing from the purchase and sale with all the stock and the complete interest in the commercial real property enrichment. Those were the two things she walked away from with the deal. But what's relevant in this divorce proceeding is that the collateral was mixed. It was both marital and non-marital. There was one piece of marital property that was part of the collateral. The Bayview residence is the piece of marital property of which you speak. It was a stipulation, but it was the party's marital residence. It was a property into which Jim Pappas converted the money he sold from his old house when they bought that house. We're not disputing it's marital property, but of the $3 million that was borrowed, $300,000 or is that 10%? No, that's 1% is marital property. So how can this property be marital? It's not the proportionality that's at issue. It's whether or not marital assets or marital security goes into the mix. Well, but this was just tertiary collateral. I mean, there was much more collateral worth much more that the bank looked to, and I believe there was testimony to that effect, correct? Justice, it's not a matter of the economics and the value of the collateral, notwithstanding what the trial court made a finding to. Under the case of Hagee, under the case of Kennedy, second and first district case respectively, if there is both spouses that sign a mortgage or both spouses sign a personal guarantee, it precludes the non-marital claimant from overriding the marital property presumption. Hagee is absolutely clear on this point, and so is Kennedy, and so is the new statute, 6.5. Those cases are distinguishable in certain ways, but I think isn't what's pivotal here really the fact that these mortgages contain specific language that he was just joining in the mortgage to pledge his interest in the premises, and then his interest was really just his homestead rights that he waived? I mean, if we look at that language, that's really what's key here, and I think what we need to focus on, isn't it? Well, I respectfully want to direct your Honor's attention to, for example, the continuing unconditional guarantee exhibited by the- He never had to pay anything, did he? Pardon me? He never had to pay anything back. He never had to be guaranteed it, and the guarantee was removed, but he- Events subsequent- Some loans were repaid in other ways. Events subsequent to the transaction by which the stock was received, that seals the characterization. Subsequent events don't impact that. They just don't. Characterization is determined at the time the property is acquired, not how it's dealt with thereafter. Future events are not relevant under the IMDMA and the case law to determine the characterization. The characterization is determined at the time of the acquisition and the facts surrounding the acquisition. It's limited. It's not future events. But under 6.5, there is some issue of after the issue, and it says, to the extent that the marital estate repays any portion of the loan, it shall be considered a contribution from the estate and would be paid back. There was nothing used. 6.5, and the provision of which you speak, deals with reimbursements between estates. Characterization is existential. It's not a question of reimbursement. Characterization is fundamentally, what is this when I got it? Was it marital? Was it non-marital? You decide the characterization first. Once the characterization of the asset is determined, and things happen in the future, and one estate helps it out or one estate, then that triggers rights of reimbursement potentially. But reimbursement is a separate, substantive question under the IMDMA. Separate and distinct from characterization. Fundamentally, the characterization must be decided first. And the new statute is a complication of existing common law. But now, if Kathy purchased these shares, she never spent a dime of her own money to do that. Isn't that correct? And we never saw any price per share either. Well, the shares, there were 150 shares, and the price was $2 million. I can't do the math standing here, but the price per share would be the division between the two numbers. Kathy, again, in this transaction where $7 million was at issue and $3.6 million was, again, this is purchase money. This is fresh money. That's what this new statute is talking about. If during the marriage you go out and borrow money, and it's fresh money, what is the characterization of that fresh money? Now, if it's solely or entirely non-marital to support as collateral to support the loan, then the loan is cloaked with non-marital characterization. But one personal guarantee, one mortgage takes that or alters it and disenables the non-marital claimant from saying, I borrowed this money, but the money I borrowed is non-marital. How can it be? The marital property presumption says all property acquired during the marriage is presumptively marital. So if you borrow money, it's presumptively marital. There is no case in Illinois that says exactly what you just said with respect to the collateral, though, is there? The facts of each of the cases you talked about are somewhat different in terms of when the person actually acquired the assets. So we don't have a case exactly on point here, do we? I would argue that Heggie is on point, and Kennedy is also on point. Arnold Forbes? I think so, yes. Let me ask you this. What if Kathy had received her one-third share of the trust in cash? I'm sorry, her what share? Her one-third share of the trust, and one of her brothers had assumed control of the business, would her cash have been an inheritance? I don't understand the hypothetical. In other words, if this was a little bit different, what if the three of them had sold the family business and split the proceeds three ways? Would the cash that Kathy had received been an inheritance? In order for Kathy to have received any asset in the trust as a legacy, it would have had to be pursuant to the will and the trust, and there would have to be to the exclusion of any participation of her husband in any commercial or other kind of financing, and it would have to be exclusive of any financing, because the testator said, Here's what I have. It's going in a trust. He was divorced, by the way, from his wife, but he left it for her anyway, so that was nice. Here's what I have, and Mary Jane's going to control it. She's going to be the trustee, and when she dies, whatever's left is going to go, per sterpes, to my descendants. But he didn't say one-third of Olson is to go to each of the children, did he? I agree. I can see that. Absolutely. But he also didn't say, and if there's an insufficient amount of money, then the family can borrow money. The way in which the settlement agreement came into being, was effectuated, and all the people involved, it was not consistent with the way the estate was. Mr. Pappas was never involved. He was not a beneficiary. He only became involved, if we're going to use that word, by request from Cathy. It had nothing, the estate didn't ask him to do it, right? I would think that's correct. He was involved in two capacities, a guarantor and a mortgage owner. But the estate did not ask him to do that. That was a request for Cathy as opposed to anybody else. Not necessarily, because the estate and all of its participants benefited from Cathy borrowing that money through the corporation. In order for the bank to lend the money, in order for First DuPage Bank to lend the money, continuing unconditional guarantees, lender has required that the guarantors execute and deliver this. It's not optional. It wasn't just like, let's do it just to do it. The lender insisted upon Jim Pappas signing the guarantees and signing off on the mortgages. It was an absolute requirement. It wasn't an option. In order for the estate to get their money, this is how they were going to get their money. She was going to borrow it. So yes, whether they directly wanted him to participate or not, I don't think they cared. They just wanted their money. All right. Thank you, counsel. Thank you, Justice. Well, I guess we're here to talk more about the collateral, because that's what counsel seems to be hanging a lot of its argument on. You know, the cases that we cited in the brief make pretty clear the tertiary collateral that is never foreclosed upon, where marital collateral is effectively theoretical, that is never looked to, that is never foreclosed upon, cannot by itself result in a transmutation of the property to marital property. Well, what about 6.5 of the revised property? I think that that is a codification of that idea. Many of this Court's prior cases, now there's a couple outliers. I think the Hagee case is an outlier to 6.5 now. I think the Samarja case from the 3rd District from about 10 years ago wouldn't be decided the same way under 6.5. But most of the prior case law is consistent with what 6.5 says. And if anything, if anything, so it's effectively a codification. I'd agree with Mr. Tribe. But if it's anything, it's a big statement from the legislature that there's not going to be transmutation. We're just talking about a potential right to reimbursement when there's something to reimburse. But it does say, all property acquired by the spouse, by a spouse, by the sole use of non-marital property as collateral. That seems to be the, a rather significant issue. By the words you use, sole? Sole use of non-marital. I hear you. And I'll back up briefly. I'm not trying to make an academic point because I don't want to get too far down this rabbit hole. But it's not 100% clear to me whether the new statutory amendments will even apply. I mean, the new amendments took effect January 1 of this year. The statute says it applies to pending cases. I'm not sure if that catches a case on appeal or not. We could get into a land graph analysis about retroactive and prospective application of the statute. Well, even if it doesn't, we still look to what the current state of the law is to make, to see the intent here to see what the issue could be and how it could be resolved. That's correct. And the cases that we have cited make clear that tertiary collateral doesn't result in transmutation. Without a foreclosure on the theoretical marital collateral, there's no characterization problem. There's potentially reimbursement. But what would we reimburse him for? To the points that were raised when Mr. Gerage was addressing the court, what did he do? He waived his homestead rights. That's a meaningless act. It's under federal cases, under state cases. That doesn't create any rights. What did he sign? A personal guarantee? He testified at trial it was worthless because he didn't own anything. This was the third or fourth layer of collateral behind the stock, the equipment, the accounts receivable, life insurance policies if my client died. What was at risk? The notion that we could create $7 million worth of marital property could be created by signing a worthless personal guarantee? I don't think that that finds any support in the cases anywhere. The cases that have relied on property that was acquired on marital credit, talking about primary liability, primary mortgage liability, primary business liability, when you're the first person in line to have to pay and your wages, and your wages that are the product of your marital efforts of going to work every day, repay the loan. That's where you've trended to see the older cases prior to 6.5 find a transmutation and find a marital property. It's not what you have here. It's not what you have here. What? And I might add, Mr. Drudge made the comment that the bank insisted, insisted on his client signing. I don't find that in the record. I know that there's nothing in the record that the bank insisted on anything. If anything, Mr. Papp has injected himself into this process. He had nothing to pledge. What would the bank need him for? What this, I'm also, apparently I have some problems with the real estate here. The, something happened in Wisconsin that ended up putting a significant debt back into some entity that Kathy controlled. What was that about? That was a separate real estate trust. That was handled in a very similar way to the way that the AFA trust was. The properties were all valued, and the company, and the brothers and my client distributed the value accordingly, according to the trust that each walked away with a third. Yes. Okay, but was there some sort of a debt out of that that went into Kathy as to LLC or something, some property that was up in Wisconsin, or was that something I was just imagining here? I don't know how it affects the shares, the characterization of the shares. There were several real estate trusts, and maybe I'm not speaking, maybe I'm not thinking the right one you're thinking of, but the real estate was handled in separate trusts that were separate from the AFA revocable trusts where the shares were, where the shares of the marketable securities were. They were part of this, but they don't affect the characterization question that we have before us. Was there an entity in Wisconsin that was operating when Mr. Asta died? When Mr. Asta died? Olson of Wisconsin or something like that? Olson, Wisconsin, correct. All right, but that doesn't exist anymore, and that wasn't part of this process. That's correct, and again, there's nothing in the will or in the trust that required Kathy or her sibling or her two brothers to receive a third of Olson, and a third of Olson, Wisconsin, and a third of the cash and marketable securities. There's nothing that specific of a device in any of the testamentary documents. So I can't emphasize that enough because that's a lot of the reasoning that you're hearing from the other side. It's what the circuit court effectively relied on, that because Kathy Asta didn't walk away with just a third of the stock and a third of the marketable securities, because they did something different here, that that somehow means that they did something contrary to the intentions of the will and the trust, and that's just not the case. If Mary Jane had died and the three siblings made these agreements with the help of the probate court that, okay, you don't want to run the business anymore, I'll run the business, we'll do it this way, would that be pure inheritance, even if there was a transfer of money for the shares? In other words, is Mary Jane's still being alive create any sort of a problem here? No, because she exercised her authority that was granted to her in the trust to distribute the assets pursuant to the agreement while she was alive. If she was dead and there had been no prior transfers to the shares, and it was just the children and the probate judge left to figure this out for themselves, I think they could have done exactly what they did. What did they do? My client got $2 million worth of stock. These other two siblings got a like amount in cash. That's a classic purse derpies one-third general disposition of the estate and trust, and that's what their father wanted, and nothing more and nothing less and nothing more specific than that. Now, you rely on the case of in-ray marriage in Blunda to support your position, but in Blunda, the husband didn't sign a personal guarantee, did he? And the collateral for the loan there didn't include any marital property, so doesn't that case in some way support your opponent's position rather than yours? Why is this case helpful to the position you are asserting? Because there was no marital funds injected into any of the loan payouts or the transaction. That's what's similar to here. The marital estate was never a risk for anything aside from our theoretical fourth layer of collateral. No marital funds went to repay this. The company took the loan. The company serviced the loan. All of this came from the company and acted outside the marital estate and the joint efforts of Jim and Kathy. And that was really more of a right of reimbursement type case too, wasn't it? Exactly, and that's going back to 6.5, whether it applies or not. At most, that's what Mr. Pappas might have had a claim here to. He didn't make a claim for any sort of reimbursement. His position at trial was all or nothing, and Judge Johnson realized that. When it came before him for trial, he said very correctly, it's an all or nothing proposition. Mr. Pappas made no claim for alimony, whether that be periodic, permanent, or alimony in gross, which is sometimes a form of relief you see when there's a lot of non-marital property and very little marital property. Made no claim for maintenance. Made no claim for reimbursement to try to bring money back into the marital estate from Kathy's non-marital estate. Didn't try any of that. It was, this is marital, and I win, and maybe I'll make a lot of money here. Or it's non-marital, I'm going to go back to South Carolina with very little, because the rest of the marital estate was effectively annihilated in transaction costs and paying the lawyers in advances during the pendency of this case, which took three years to get to trial. We raised a question, and now it's gone. Let me ask a question. You argued on the point of distribution of the marital property that the trial court erred in awarding James too much, but didn't the court really take into account his performance or alleged lack of performance in the company by deciding that a 71-29 or 70-30 split was appropriate? And if that wasn't appropriate, what would have been more equitable? Something far less than a million and a half dollars. I understand that this brings me in the realm of manifest weight review, and the court has much more discretion to actually divide the pot once we decide what's supposed to be in the pot. But on these facts, when the judgment is replete with findings not even challenged by the other side of all the negative contribution that Mr. Pappas was to the marital estate and was to this company, looting the company, taking illegal distributions, all of which are set forth in the judgment, none of those factual findings are challenged. And for this million and a half dollars that he got to be the product of the characterization of the company as marital, which really can only be marital by way, if you buy into this tertiary collateral, constituting or somehow making this marital property. On those facts, that this is a long-standing family company, for him to walk away for a million and a half dollars from this divorce after all the other pre-distributions, pre-distributed over $600,000 that the judge never even mentioned in the judgment, that is not equitable for purposes of Section 503D from our position. I don't care if it's 70-30 or not. Letting him walk with a million and a half dollars is not equitable on these facts. It should be something far less. The cases support the proposition that equitable in this state does not mean equal. It means equitable. And that doesn't mean 70-30 is equitable either because, you know, the divorce laws are not supposed to be a winning lottery ticket, and that's what this is. If signing a worthless piece of paper, signing a worthless document that was a personal guarantee could somehow create $7 million for the property. I think that's what the divorce laws, the property laws were supposed to accomplish. I remembered my question. Thank you. Is one of the reasons that he thinks, at least in your mind, that he's entitled to more, is because he gave up maintenance? Is that what one of the issues might have been at trial? He waived maintenance. There was an intent pre-trial. I don't know if you caught this in the pre-trial proceedings. There was a claim of cohabitation. We litigated that. When the time came for trial, he just laid down his sword and said, I won't ask for maintenance. Does that go to, you know, him perhaps getting a larger share than he might otherwise have been equitably entitled to? I suppose it's one consideration. I would certainly concede that. But, again, he didn't pursue it. And there was any number of alternative theories that could have been pursued here, whether that be rights of reimbursement or maintenance claims, if this company turned out to be non-marital, which we believe it should be. Any further questions? Thank you very much for your time. Mr. Gerash? May I continue from that point? Well, we're on cross-rebuttal, I guess. I'm not sure what we're on. Just this issue, though. This is the issue we're discussing. Equitable distribution. Why do you think your client should receive more of the distribution? Absolutely. I agree that this is not an equal distribution state. It's an equitable distribution state. To answer your question, we waived maintenance not for tactical reasons, but because Mr. Pappas got a job. He finally got a job working, and he was making enough of the time to support his expenses. So we felt it was appropriate that we weren't going to ask for maintenance at trial because we didn't think it made sense. But we felt that we were going to have to do it substantively in the issues in the case. Notwithstanding that, if you look at Section 503D, it lists out 12 different factors. A lot of focus here has been on the contribution, that the stock was received by Kathy. But there's a lot of other factors, and I know Judge Johnson went through and said, I considered all the factors, and if I didn't mention one, it's because I didn't give it much weight. I think that's what he said in his trial judgment. And both sides can see the facts in this case as found by the trial court. So we're not taking issue with, in each of his individual factors, what he did fine. But I think it's an abuse of discretion that he only gave the weaker party 29% of the marital estate. If you just even read the words that Judge Johnson, his findings in his judgment, he finds that Kathy had a non-marital estate. This is after he distributed his judgment. Her non-marital estate was worth about $700,000. That's a factor. Jim's was worth zero. So right there, Kathy's much more powerful than Jay. That's a factor. It was a 15-year marriage. This was not a short-term marriage. This was a mid- to a long-term marriage. That's a factor. These parties had a nice lifestyle. They had a plane. They had boats. They went on trips. They did a lot of things. And the judge found that they had similar lifestyle needs based upon the standard of living enjoyed during the marriage. The judge went on to find the amount and sources of the income of Kathy Asta today far exceed those of Jim Pappas. He found her income to be $422,000 a year, where Jim's income was 71 without overtime, 102 with overtime. He's working as a laborer. She's running a company. And one of the other factors, which I think is also huge, is the reasonable opportunity of Kathy for future acquisition of capital assets, an income far exceed that of James, no matter how you look at it. Whether Jim was an excellent contributor at the company or he was terrible, we accept that the judge found that he made a minimal contribution at the company and to the acquisition of the stock. And Kathy made a superior contribution because that's what the judge found. But every other factor on your 503D dictates that Jim is the weaker party. This guy is down and out. And it's just not equitable to limit him to 29% of the marital estate. It should be a 50-50 distribution. It's an abuse of discretion. And I think any other trial judge would have found much more close to 50-50. But isn't your argument then that different weight should have been put on each of these factors? And it's up to the trial judge, really, to decide how much weight to give to each of these factors, is it not? It's up to the trial judge to decide that. I think we can't re-weigh that. We can't re-weigh and we don't know how much weight he gave to each of those factors. Under the standard of review, the appellate court can review for abuse of discretion not what was determined on each factor, but when the judge put all the factors together and, yes, in weighing them and all that. And, yes, that is subject to abuse of discretion for sure. On each individual one, that's manifest weight. So no reasonable person could have come to that conclusion? No reasonable trial judge would give the weaker party 29 percent of the marital estate under these circumstances. Absolutely not. In any case, it would be a 50-50 distribution. At worst, a 60-40 distribution. 70-30 goes way too far. What happened to the airplane? The airplane was sold during the marriage. During the marriage, the parties had this friend, Rosie, and Rosie, I think, had a plane. And Kathy and Jim were excited about it and they bought the plane. And she was flown from California here. Jim never quite got the plane license, so it just sat in a hangar. And when the divorce case all started up, they got rid of the plane. It was sold. Somebody came and picked up the plane, and that was it. What about the boat? Is it in the Carolinas, or has it gone to? Well, for clarification, Jim is in a rental apartment in South Carolina. The vacation residence in South Carolina was sold during the pendency of the state by agreement and the proceeds divided between the parties. The other boat is just an upside-down boat, not worth very much. And I think Jim either sold it because he had to, or he's got it down in South Carolina. But it's a negative asset. So as counsel indicated, there were other distributions before this final distribution that went to pieces of property that had been sold or resolved before the actual divorce. Yes, if I may, this is important. I'd like to direct all three of you justices to take a look at my reply brief. In painstaking detail, I cite all of the documents, and on page 6 and page 7 show this court exactly what assets there were, what they were worth, how they were distributed, and it comes out to Jim received 29.1%. Again, received? I don't think so. He didn't get that $1.5 million. He didn't get that money yet. That money is tied up in this appeal. This guy is trying to insist on whatever he can put together, but that has yet to come to fruition. But assumptively, if there wasn't an appeal and he was paid $1.5 million that day, with the prior distributions, which I delineate each and every one of them and cite where they come from, he would have got a total of, it looks like, $1.9 million. That's worth the $1.5 because there were some pre-distributions. I counted the attorney's fees, the interim fee awards, I counted each and every one of them. I even counted the money he paid out of his pocket before we had to go to interim fees because he ran out of money. This case was pending for four years. It was extremely difficult. We tried summary judgment on maintenance. We had a full trial on maintenance during the case. There were all kinds of issues. This was not an easy case to try on either side. It was complicated, and it took a long time. Thank you, counsel. I think we've exhausted our questions at this point. Very well. Thank you for having me. We appreciate your argument. We will take the matter under advisement, and we will issue a decision in due course. We'll stand in recess to prepare for our next case. Thank you.